## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| UNITED FOR FBI INTEGRITY, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 22-2885 (RC) |
| | : | | |
| v. | : | Re Document No.: | 13, 15 |
| | : | | |
| U.S. DEPARTMENT OF JUSTICE, | : | | |
| | : | | |
| Defendant. | : | | |

### MEMORANDUM OPINION

GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

AND GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY

JUDGMENT

## I.  INTRODUCTION

Plaintiff United for FBI Integrity brings this action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, against Defendant U.S. Department of Justice ("DOJ").  Plaintiff seeks documents from the Federal Bureau of Investigation ("FBI") and the DOJ's Office of the Inspector General ("OIG") pertaining to former FBI Associate Deputy Director Jeffrey S. Sallet's retirement and any possible allegations of misconduct against Mr. Sallet.  Defendant responded primarily by issuing *Glomar* responses that refuse to confirm or deny the existence of the records sought, citing FOIA Exemptions 6 and (7)(C).[1]  For the reasons set forth below, the Court finds that Defendant's *Glomar* responses are justified for some but not all of the requested

---

[1] The term "*Glomar* response" is derived from a FOIA case where the CIA "successfully refused to confirm or deny whether it had records about a ship called the Glomar Explorer." *Knight First Amend. Inst. at Columbia Univ. v. CIA*, 11 F.4th 810, 813 (D.C. Cir. 2021).

records.  The Court therefore grants in part and denies in part Defendant's motion for summary judgment and grants in part and denies in part Plaintiff's cross-motion for summary judgment.

## II.  FACTUAL BACKGROUND

### A.  Michael Zummer and Jeffrey Sallet

To make sense of this FOIA request, it is helpful to introduce two central figures. Michael S. Zummer serves as counsel for Plaintiff, United for FBI Integrity, a non-profit organization that seeks reform of the FBI.  Zummer Decl. ¶ 6, ECF No. 15-3; *see generally* Complaint ("Compl.") ECF No. 1.  Mr. Zummer was previously in-house counsel for Plaintiff from August 2020 until January 2022, and Mr. Zummer is currently president of "Accountability FBI, Inc." which is a distinct organization from Plaintiff.  Zummer Decl. ¶ 6.  Mr. Zummer worked for the FBI from 1999 to 2003, and then again from 2008 through 2016, when he was served as a special agent in New Orleans, LA.  *Id.* ¶ 2.

In 2016, Mr. Zummer sent a letter to Judge Kurt D. Engelhardt of the U.S. District Court for the Eastern District of Louisiana, describing what he believed were ethical violations by the U.S. Attorney's Office for the Eastern District of Louisiana in the case.  *Id.* ¶ 64.  Mr. Zummer sought but did not receive permission from the DOJ to send the letter.  *Id.* ¶ 76.  After Mr. Zummer sent the letter, the FBI suspended, and later revoked, his security clearance.  *Id.* ¶¶ 79, 83.  The loss of Mr. Zummer's security clearance ended his employment with the FBI.  *Id.* ¶ 83.

Jeffrey S. Sallet served as Associate Deputy Director of the FBI, the third-highest position with the FBI, for approximately nine months between February 2021 and November 2021.  *Id.* ¶¶ 7–8.  Mr. Sallet worked for the FBI for more than 25 years, *id.* ¶ 56, and served as Special Agent in Charge of the FBI's New Orleans office at the time that Mr. Zummer sent his letter in 2016, *id.* ¶¶ 12, 64.  Mr. Zummer believes that Mr. Sallet was the "primary

decisionmaker" in having his security clearance suspended, and while it is unclear from the record if this characterization is correct, Mr. Sallet did play some role in the process.  *Id.* ¶ 79.

Mr. Zummer reported the revocation of his security clearance to the OIG, claiming it was retaliatory action for his protected First Amendment speech to Judge Engelhardt.  *Id.*  The OIG, which examines misconduct within the DOJ and FBI, conducted an investigation and found that Mr. Zummer's disclosure to a federal judge was not protected by the FBI's whistleblower regulations.  *See* Zummer Decl., Ex. E at 41, ECF No. 15-4.  But the OIG did find "troubling errors and omissions" related to the suspension of Mr. Zummer's security clearance and recommended these be considered in further proceedings about his clearance.  *Id.*  In this report, OIG also investigated Mr. Zummer's claims that he experienced an earlier episode of retaliation from the FBI based on his 2013 disclosure to the OIG of what he believed to be a conflict of interest within the USAO.  *Id.*  The OIG found "insufficient evidence" to support this retaliation claim.  *Id.*

In addition to his complaint to the OIG, Mr. Zummer filed a federal lawsuit to challenge an alleged violation of his First Amendment rights.  The district court dismissed his claim relating to the revocation of his security clearance as falling outside the court's subject-matter jurisdiction.  *Zummer v. Sallet*, No. 17-cv-7563, 2019 WL 4213512, at *8 (E.D. La. Sept. 5, 2019), *order amended on denial of reconsideration*, No. 17-cv-7563, 2019 WL 5294944, at *3 (E.D. La. Oct. 18, 2019).  The Fifth Circuit affirmed.  *Zummer v. Sallet*, 37 F.4th 996, 1013 (5th Cir. 2022).  The district court did not dismiss Mr. Zummer's claim seeking to have an unredacted version of his letter to Judge Engelhardt released to the public.  In 2021, Mr. Zummer and the FBI settled that claim, and an unredacted version was released.  *See* Settlement Agreement and Release at 1, *Zummer v. Sallet*, No. 17-cv-7563, ECF No. 127.

Lastly, through Mr. Zummer, Plaintiff alleges that Mr. Sallet's retirement after nine

months as Associate Deputy Director was "sudden" and surprising to "[v]arious FBI employees"

because it was not announced beforehand.  Zummer Decl. ¶ 13.  Mr. Zummer further claims that

he "heard from various current and former FBI employees that allegations of sexual impropriety

against Sallet had caused him to retire," *id.* ¶ 14, including that Mr. Sallet made sexual advances

or conducted sexual relations with other FBI employees, and made inappropriate comments in

the workplace, *id.*  Mr. Zummer does not provide names or any identifying information about the

FBI employees he purportedly spoke to.  *Id.*  Beyond Mr. Zummer's word about what he has

heard from others, Plaintiff presents no other evidence for these contentions about Mr. Sallet's

retirement and conduct.

## B.  FOIA Requests

On November 9, 2021, Plaintiff submitted a FOIA request to the FBI, seeking three

related categories of records relating to Mr. Sallet, his retirement, and any possible allegations of

misconduct or wrongdoing against him.[2]  Compl. ¶ 12.  More specifically, Plaintiff requested:

> a.      [R]ecords documenting any and all communications by or with FBI
> Director Christopher Wray, FBI Deputy Director Paul Abbate, or any of their staffs,
> regarding allegations of misconduct, wrongdoing, malfeasance and/or the
> retirement of Jeffrey Stephen Sallet, aka Jeff Sallet, Associate Deputy Director of
> the FBI, between April 1, 2021 and November 5, 2021.  Records include, but are
> not limited to, e-mails, memoranda, notes, and text messages.
>
> b.      [R]ecords held by the FBI Inspection Division regarding any allegations of
> misconduct against, or investigations of, Jeffrey Stephen Sallet, aka Jeff Sallet,
> formerly [Special Agent in Charge "SAC"] New Orleans, SAC Chicago, Associate
> [Executive Assistant Director "EAD"] Facilities and Finance Division, EAD
> Human Resources Branch, and Associate Deputy Director of the FBI, between
> September 30, 2016 and November 5[,] 2021.  Records include, but are not limited

---

[2] Plaintiff made these requests under its previous name "Protect the FBI."  Compl. ¶ 3.
Plaintiff adopted its current name on September 19, 2022.  *Id.*

to, complaints, allegations, investigative files, and dispositions of any allegations or investigations.

c.      [R]ecords held by the FBI Office of Professional Responsibility (OPR) regarding any allegations of misconduct against, investigations of, or adjudication of charges against, Jeffrey Stephen Sallet, aka Jeff Sallet, formerly SAC New Orleans, SAC Chicago, Associate EAD Facilities and Finance Division, EAD Human Resources Branch, and Associate Deputy Director of the FBI, between September 30, 2016 and November 5[,] 2021.  Records include, but are not limited to, complaints, allegations, investigative files, and dispositions of any allegations, investigations, or disciplinary charges.

*Id.*

On November 18, 2021, the FBI denied Plaintiff's requests, invoking FOIA Exemption 6

and 7(C) as part of a *Glomar* response:

You have requested records on one or more third party individuals. Please be advised the FBI will neither confirm nor deny the existence of such records pursuant to FOIA exemptions (b)(6) and (b)(7)(C), 5 U.S.C. §§ 552(b)(6) and (b)(7)(C). The mere acknowledgement of the existence of FBI records on third party individuals could reasonably be expected to constitute an unwarranted invasion of personal privacy. This is our standard response to such requests and should not be taken to mean that records do, or do not, exist.

*Id.* ¶ 13.  On January 25, 2022, Plaintiff appealed the FBI's decision, and the DOJ affirmed on

May 19, 2022.  *Id.* ¶¶ 14–15.

On the same day that Plaintiff made its FOIA request to the FBI, November 9, 2021,

Plaintiff submitted a similar request to the OIG seeking:

[R]ecords regarding any allegations of misconduct against, or investigations of, Jeffrey Stephen Sallet, aka Jeff Sallet, formerly of the FBI, formerly SAC New Orleans, SAC Chicago, Associate EAD Facilities and Finance Division, EAD Human Resources Branch, and Associate Deputy Director of the FBI, between September 30, 2016 and November 5[,] 2021.  Records include, but are not limited to, complaints, allegations, investigative files, and dispositions of any allegations or investigations.

*Id.* ¶ 16.  On November 23, 2021, the OIG answered with a *Glomar* response citing Exemption

7(C):

[Y]ou seek records relating to Jeffrey Stephen Sallet. Because your request seeks investigatory records, we will neither confirm nor deny the existence of any such records. Without the consent of the individuals you mention, an official acknowledgement of an investigation involving them, or an overriding public interest, acknowledging the existence of such records could reasonably be expected to constitute an unwarranted invasion of privacy. 5 U.S.C. §552(b)(7)(C)

*Id.* ¶ 17.

On January 25, 2022, Plaintiff appealed the OIG's decision, and the DOJ affirmed on April 25, 2022. *Id.* ¶¶ 18–19.

Plaintiff filed this complaint on September 22, 2022, asking the Court to order Defendant to search for and disclose any and all records responsive to the FOIA requests. *Id.* ¶ 22. After the complaint was filed, DOJ informed Plaintiff that the FBI conducted a search of the electronic communications of FBI Director Christopher Wray, Deputy Director Paul Abbate, Chief of Staff Corey Ellis, and Mr. Sallet for emails related to Mr. Sallet's retirement. Decl. of Joseph E. Bender, Jr. ("Bender Decl.") ¶ 12, ECF No. 13-3. The FBI found no responsive records. *Id.* Plaintiff does not challenge the adequacy of the FBI's search for this subset of records.

Defendant DOJ moved for summary judgment that the FBI and OIG had properly issued a *Glomar* response under FOIA Exemptions 6 and 7(C). *See generally* Def.'s Mot. Summ. J. ("Def.'s Mot."), ECF No. 13; Def.'s Mem. P&A Supp. Mot. Summ. J. ("Def.'s Mem."), ECF No. 13-1. In support of its motion, DOJ relies on the declaration of Joseph E. Bender of the FBI and Deborah Marie Waller of the OIG. *See* Bender Decl.; Decl. of Deborah Marie Waller ("Waller Decl."), ECF No. 13-4. Plaintiff opposed and cross-moved for summary judgment seeking an order that FBI and OIG conduct a search for all records sought in its requests. *See* Pl.'s Opp'n Def.'s Mot. Summ. J. ("Pl.'s Opp'n"), ECF No. 14; Pl.'s Cross-Mot. Summ. J. ("Pl.'s Cross-Mot."), ECF No. 15; Pl,'s Mem. P&A Supp. Cross-Mot. Summ. J. ("Pl.'s Mem."), ECF No. 15-1. As noted previously, Plaintiff presents a declaration by Mr. Zummer, as well as a

declaration from the organization's president, James J. Davidson.  *See* Zummer Decl.; Decl. of

James J. Davidson ("Davidson Decl.), ECF No. 15-5.  The motions are fully briefed.  *See* Def.'s

Reply Supp. Mot. Summ. J. & Opp'n Pl.'s Cross-Mot. Summ. J. ("Def.'s Reply"), ECF No. 17;

Pl.'s Reply Supp. Cross-Mot. Summ. J. ("Pl.'s Reply"), ECF No. 19.

### III.  LEGAL STANDARD

The Freedom of Information Act is meant "to pierce the veil of administrative secrecy

and to open agency action to the light of public scrutiny."  *U.S. Dep't of State v. Ray*, 502 U.S.

164, 173 (1991) (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976)).  It "directs that

'each agency, upon any request for records ... shall make the records promptly available to any

person' unless the requested records fall within one of the statute's nine exemptions."  *Loving v.

Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008) (quoting 5 U.S.C. § 552(a)(3)(a)). "Consistent

with the Act's goal of broad disclosure," those exemptions should be "given a narrow compass."

*U.S. Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 151 (1989).  "The agency bears the burden of

establishing that a claimed exemption applies."  *Citizens for Resp. & Ethics in Wash.*, *v. U.S.

Dep't of Just. ("CREW")*, 746 F.3d 1082, 1088 (D.C. Cir. 2014).

Because FOIA cases do not ordinarily involve disputed facts, they "typically and

appropriately are decided on motions for summary judgment."  *Defs. of Wildlife v. U.S. Border

Patrol,* 623 F. Supp. 2d 83, 87 (D.D.C. 2009*)*.  Summary judgment is warranted "if the movant

shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In assessing whether the movant has met

that burden, a court "must view the evidence in the light most favorable to the nonmoving party,

draw all reasonable inferences in his favor, and eschew making credibility determinations or

weighing the evidence."  *Montgomery v. Chao*, 546 F.3d 703, 706 (D.C. Cir. 2008).  "This

burden does not shift even when the requester files a cross-motion for summary judgment because 'the Government ultimately has the onus of proving that the documents are exempt from disclosure.'"  *Hardy v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 243 F. Supp. 3d 155, 162 (D.D.C. 2017) (cleaned up) (quoting *Pub. Citizen Health Rsch. Grp. v. FDA*, 185 F.3d 898, 904–05 (D.C. Cir. 1999)).  And even if a FOIA exemption applies, an agency cannot withhold information unless it also "reasonably foresees that disclosure would harm an interest protected by" the exemption.  5 U.S.C. § 552(a)(8)(A)(i)(I); *see Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 369 (D.C. Cir. 2021) (explaining the FOIA Improvement Act of 2016's "foreseeable harm" requirement).

In a typical FOIA case, "[a]n agency ... must search for any documents responsive to the request, and must 'disclose all reasonably segregable, nonexempt portions of the requested record(s).'"  *People for the Ethical Treatment of Animals v. Nat'l Insts. of Health, Dep't of Health & Hum. Servs. ("PETA")*, 745 F.3d 535, 540 (D.C. Cir. 2014) (quoting *Assassination Archives & Rsch. Ctr. v. CIA*, 334 F.3d 55, 58 (D.C. Cir. 2003)).  There are, however, certain cases in which "merely acknowledging the existence of responsive records would itself 'cause harm cognizable under [a] FOIA exception.'"  *Id.* (quoting *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007)).  In such cases, an agency may issue a *Glomar* response, "refus[ing] to confirm or deny the existence or nonexistence of responsive records . . . ."  *Elec. Priv. Info. Ctr. v. Nat'l Sec. Agency ("EPIC")*, 678 F.3d 926, 931 (D.C. Cir. 2012).  A *Glomar* response is available to an agency only "if the fact of the existence or nonexistence of agency records falls within a FOIA exemption."  *PETA*, 745 F.3d at 540 (quoting *Wolf*, 473 F.3d at 374); *see Competitive Enter. Inst. v. Nat'l Sec. Agency*, 78 F. Supp. 3d 45, 53 (D.D.C. 2015) ("[T]he Government must

show that the mere fact of whether it has (or does not have) relevant records is protected from disclosure under an exemption.").

 "In considering a *Glomar* response, courts apply the 'general exemption review standards established in non-*Glomar* cases.'"  *Knight First Amend. Inst. at Columbia Univ. v. CIA*, 11 F.4th 810, 813 (D.C. Cir. 2021) (quoting *Wolf*, 473 F.3d at 374).  "An agency thus bears the burden to sustain a *Glomar* response."  *Id.* (citing 5 U.S.C. § 552(a)(4)(B)).  One way in which an agency may successfully carry its burden is by submitting "affidavits explaining the basis for the response."  *PETA*, 745 F.3d at 540.  "An agency is entitled to summary judgment if its affidavits are reasonably specific and are not substantially called into question by contradictory evidence."  *Schaerr v. U.S. Dep't of Just.*, 69 F.4th 924, 928 (D.C. Cir. 2023); *see also SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (explaining that the affidavits must be "relatively detailed[,] non-conclusory, and ... submitted in good faith" (quoting *Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981))).  Such affidavits or declarations are "accorded a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'"  *Id.* (quoting *Ground Saucer Watch*, 692 F.2d at 771).

## IV.  ANALYSIS

The Court moves forward as follows.  First, it discusses FOIA Exemptions 6 and 7(C), and assesses whether all remaining requested documents would have been compiled for law enforcement purposes and therefore fall under Exemption 7(C).  The Court finds that Exemption 7(C) does not categorically apply to all possible records, but that this issue is not dispositive to the outcome.  Next, to begin the balancing test, the Court reviews Mr. Sallet's privacy interests and finds that they are substantial but diminished in some respects.  Beyond that, the Court

assesses the public interest in four parts: first, any public interest related to Mr. Sallet's involvement in Mr. Zummer's loss of security clearance and alleged violation of Mr. Zummer's First Amendment rights; second, any public interest related to Plaintiff's allegations that Mr. Zummer committed sexual misconduct; third, any public interest in exposing wrongdoing by the OIG in its report about Mr. Zummer, and fourth, any public interest in uncovering FBI's approach to disciplinary violations and the retirement practices of FBI executives. Ultimately, after balancing the interests, the Court determines that the FBI and OIG justifiably provided a *Glomar* response for much of the requested records but not for records concerning Mr. Sallet's alleged misconduct with regard to Mr. Zummer.

### A. Most But Not All Records Would Be "Law Enforcement" Records Under Exemption 7(C)

#### 1. Overview of Exemption 6 and Exemption 7(C)

FBI and the OIG invoked Exemption 6 and Exemption 7(C) to support their *Glomar* responses. Plaintiff "admits that any records responsive to its requests would meet the threshold requirement for Exemption 6," Pl.'s Mem. at 6, but disagrees that Exemption 7(C) is applicable to all of the records, *id.* at 6–7. Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy. . . ." 5 U.S.C. § 552(b)(6). Exemption 7(C) protects "records or information compiled for law enforcement purposes ... to the extent that the production of such law enforcement records or information ... could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C).

Both Exemption 6 and Exemption 7(C) require agencies and reviewing courts to "balance the privacy interests that would be compromised by disclosure against the public interest in the

release of the requested information." *Beck v. Dep't of Justice*, 997 F.2d 1489, 1491 (D.C. Cir. 1993) (quoting *Davis v. U.S. Dep't of Justice*, 968 F.2d 1276, 1281 (D.C. Cir. 1992)).  But although a balancing test applies to both Exemption 6 and 7(C), "[t]he protection available under these exemptions is not the same." *Id*.  Exemption 7(C) "provides broader privacy protection than Exemption 6 and thus 'establishes a lower bar for withholding material.'" *CREW*, 746 F.3d at 1091 n.2 (quoting *ACLU v. U.S. Dep't of Just.*, 655 F.3d 1, 6 (D.C. Cir. 2011)).

First, "whereas Exemption 6 requires that the invasion of privacy be 'clearly unwarranted,' the adverb 'clearly' is omitted from Exemption 7(C)." *U.S. Dep't of Just. v. Reps. Comm. For Freedom of Press*, 489 U.S. 749, 756 (1989).  Second, Exemption 7(C) lowers the risk of harm standard from "would constitute" to "could reasonably be expected to constitute" an invasion of privacy.  *Id.*  These differences stem from divergent statutory language between the two exemptions, which in turn reflects Congress's decision to provide the government with "greater flexibility in responding to FOIA requests for law enforcement records or information" than in responding to requests for personnel, medical, and other similar files.  *See id.* at 777 n. 22.  Because of Exemption 7(C)'s greater privacy protections, when both Exemption 6 and 7(C) could apply to all of the requested records, courts will "confine [the] analysis to Exemption 7(C)."  *PETA,* 745 F.3d at 541.

"To meet its burden of establishing that Exemption 7(C) applies [to justify withholding records], the agency must demonstrate that (1) disclosure could 'reasonably be expected to constitute an unwarranted invasion of privacy' and (2) the 'personal privacy interest' is not 'outweighed by the public interest in disclosure.'" *Elec. Priv. Info. Ctr. v. U.S. Dep't of Just.*, 18 F.4th 712, 718 (D.C. Cir. 2021) (quoting *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 160 (2004)).  "Once the agency shows that the 'privacy concerns addressed by Exemption 7(C)

are present,' the party seeking disclosure must show 'that the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake,' and that 'the information is likely to advance that interest.'" *Id.* (quoting *Favish*, 541 U.S. at 172). Exemption 6 requires a similar but more stringent showing. *See Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1228 (D.C. Cir. 2008). Notably, a requester's "personal stake in the release of the requested information is irrelevant to the balancing of public and third-party privacy interests." *Roth v. U.S. Dep't of Just.*, 642 F.3d 1161, 1177 (D.C. Cir. 2011) (internal quotation marks omitted). In summary, the Court must "weigh the public interest in the release of information against the privacy interest in nondisclosure." *Schrecker v. U.S. Dep't of Just.*, 349 F.3d 657, 661 (D.C. Cir. 2003).

### 2. Law Enforcement Records

The parties contest whether all responsive records would necessarily be law enforcement records falling under Exemption 7(C). To be a law enforcement record, a record must be "created, gathered, or used by an agency for law enforcement purposes at some time before the agency invokes the exemption." *Pub. Emps. for Env't Resp. v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mex. ("PEER")*, 740 F.3d 195, 203 (D.C. Cir. 2014).

As an initial issue, the parties disagree about what deference is due to a law enforcement agency. Generally, an agency whose "principal function is law enforcement" is entitled to deference when it claims that records relating to an external investigation were compiled for law enforcement purposes. *Id.* But this deferential standard of review is not "vacuous." *Campbell v. U.S. Dep't of Just.*, 164 F.3d 20, 32 (D.C. Cir. 1998), *as amended* (Mar. 3, 1999) (quoting *Pratt v. Webster*, 673 F.2d 408, 421 (D.C. Cir. 1982)). When a law enforcement agency "relies on declarations" to support its invocation of Exemption 7(C), those declarations must still establish

(1) "a rational nexus between the investigation and one of the agency's law enforcement duties," and (2) "a connection between an individual or incident and a possible security risk or violation of federal law." *Blackwell v. FBI*, 646 F.3d 37, 40 (D.C. Cir. 2011) (citing *Campbell,* 164 F.3d at 32).

Moreover, law enforcement agencies do not receive that same level of deference when determining whether records were compiled for law enforcement purposes when they conduct internal investigations of employees. *See Stern v. FBI*, 737 F.2d 84, 89 (D.C. Cir. 1984). This less deferential test follows from the fact that agencies inevitably monitor and collect information about their own employees. *Id.* Thus, the D.C. Circuit has developed a different approach for distinguishing between "internal investigations conducted for law enforcement purposes," *id.,* for which any records would be law enforcement records, and "general agency internal monitoring that might reveal evidence that later could give rise to a law enforcement investigation," for which they would not, *id.*

If an investigation is conducted to determine "whether to discipline employees for activity which does not constitute a violation of law, it is not for 'law enforcement purposes' under Exemption 7[(C)]." *Id.* at 90. That means an investigation merely "to insure that [the agency's] employees are acting in accordance with statutory mandate and the agency's own regulations," *Kimberlin v. Dep't of Just.*, 139 F.3d 944, 947 (D.C. Cir. 1998) (quoting *Rural Housing All. v. U.S. Dept. of Agric.*, 498 F.2d 73, 81 (D.C. Cir. 1974)), would not allow an agency to withhold related records pursuant to Exemption 7(C). Conversely, "an agency's investigation of its own employees *is* for 'law enforcement purposes' . . . if it focuses 'directly on specifically alleged illegal acts, illegal acts of particular identified officials, acts which could, if proved, result in civil or criminal sanctions.'" *Id.* (quoting *Rural Housing All.,* 498 F.2d at 81).

The purpose of the investigatory files "is the critical factor." *Rural Housing All.*, 498 F.2d at 81. With this clarifying framework in place, the Court looks to whether the FBI and OIG requests qualify under Exemption 7(C).

### 3. FBI Records

Plaintiff seeks records from high-ranking FBI officials and their staff, the FBI's Inspection Division, and the FBI's Office of Professional Responsibility. The FBI's declaration states that "Plaintiff has claimed, without evidence, that Mr. Sallet was accused of or investigated for several instances of wrongdoing," including "unlawfully retaliating against" former FBI Agent Mr. Zummer, "violating [Mr. Zummer's] constitutional rights, and engaging in workplace sexual harassment/abuse." Bender Decl. ¶ 14. The FBI further asserts that "[i]f such misconduct occurred as described by Plaintiff, the conduct could potentially constitute illegal acts that could be punished by criminal or civil sanctions." *Id.* As a result, in the FBI's view, "[i]f any investigatory records exist regarding Plaintiff's allegations, they would necessarily be records compiled for law enforcement purposes," and responsive records, "should any exist, would have been collected and maintained by the FBI as part of its law enforcement mission."[3] *Id.* ¶¶ 14–15. Consequently, DOJ asserts that Exemption 7(C) applies in full.

Plaintiff disagrees with the FBI. While Plaintiff "admits that any records of an investigation into Sallet's alleged violations of constitutional rights would be compiled for law enforcement purposes," Pl.'s Reply at 4, Plaintiff also insists that "DOJ cannot say that every possible requested record was compiled for law enforcement purposes, because not every

---

[3] If Plaintiff sought documents about a private citizen with no connection to the FBI, "the FBI's 'decision to invoke [E]xemption 7[(C)] [would be] entitled to deference' because the agency 'specializes in law enforcement.'" *Clemente v. FBI*, 867 F.3d 111, 119 (D.C. Cir. 2017) (quoting *Campbell v. U.S. Dep't of Just.*, 164 F.3d 20, 32 (D.C. Cir. 1998)).

possible allegation or investigation by either the FBI or OIG was necessarily based on alleged violations of law," *id.*

Plaintiff is correct.  Although DOJ is correct that *most* of the hypothetical FBI records sought by Plaintiff would be compiled for law enforcement purposes, the Court cannot say the same must be true for *all* possible responsive documents.[4]  The broad language of Plaintiff's requests would cover records about complaints and investigations into conduct that would not necessarily lead to civil or legal sanctions.  *See Nation Mag., Wash. Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995) (stating that agencies have "a duty to construe FOIA request[s] liberally.").  For example, Plaintiff's declaration alleges an apparently consensual affair between Mr. Sallet and another FBI employee, which violate FBI workplace policies and could lead to complaints or an investigation, but does not seem to implicate any violation of law.  *See, e.g.,* Zummer Decl. ¶ 54 (noting that FBI's offense codes for employees include consensual sexual conduct in an inappropriate location or on duty).  The sensitive nature of FBI employment makes it easy to imagine how a violation of workplace policy could also implicate civil or criminal penalties.  But that is speculative, and without more information, the FBI cannot assert that any investigative records it collects on an employee are necessarily a law enforcement record.

---

[4] The Court rejects DOJ's assertion that the "FBI properly asserted a *Glomar* response only as to 'investigative' records—i.e., records concerning 'misconduct' that 'could potentially constitute illegal acts that could be punished by criminal or civil sanctions,' and thus 'would have been collected and maintained by the FBI as part of its law enforcement mission.'" Def.'s Reply at 2 (quoting Bender Decl. ¶¶ 14–15).  Nothing in the FBI's declaration, or its *Glomar* response, indicates that it was drawing a distinction between investigative records that concerned potentially illegal acts and those that would not.  *See* Bender Decl. ¶¶ 14–15.  Indeed, the FBI did not conduct a search into its investigatory records.  Instead, much like DOJ does in its present briefing, the FBI focused narrowly on the fact that *most* of the misconduct described by Plaintiff would potentially constitute illegal acts and asserted a blanket *Glomar* response over all investigatory records.

In fact, a prior D.C. Circuit case concerning the DOJ's Office of Professional Responsibility essentially forecloses DOJ's present position.   There, the court held that an Exemption 7(C) *Glomar* response was impermissible when:

> [t]he government has not come close to showing that all records (if there are more) involving misconduct allegations against [a federal employee] would have been compiled for law enforcement purposes. Bartko's FOIA request was broadly worded to include a wide variety of actual or alleged violations by [the employee] of the U.S. Attorney's Manual, the North Carolina Code of Professional Conduct, and other ethical and legal obligations.  While violations of some of those standards could conceivably result in civil or criminal sanctions, many of them would not, and would bear only on internal disciplinary matters.

*Bartko v. U.S. Dep't of Just.*, 898 F.3d 51, 65 (D.C. Cir. 2018).

While DOJ argues that the evidentiary record supporting the FBI's claim that all records are law enforcement records is stronger in this case than in *Bartko*, the Court disagrees.  The FBI's declaration contains no details about the functions of the FBI's Inspection Division and Office of Professional Responsibility, and Plaintiff argues that these entities mostly handle allegations of administrative misconduct.  *See* Pl.'s Mem. at 9 (citing OIG, *I-2009-002 Review of the Federal Bureau of Investigation's Disciplinary System* ii–iii (2009), https://www.oversight.gov/sites/default/files/oig-reports/final_4.pdf (last visited Mar. 6, 2024)).  Thus, the FBI's bare assertions in its declaration do not alter the fact that some conceivable records about Mr. Sallet would merely concern breaches of internal FBI guidelines, and thus fall outside the scope of Exemption 7(C).  Nonetheless, as discussed below, the relevance of that hypothetical is limited in this case.

### 4.  OIG

The Court's analysis for the OIG comes out similarly.  Like the FBI declaration, the OIG declaration insists that any responsive records would have been compiled as part of an investigation "for potential criminal or civil prosecution, or administrative action by the

employing Department component," and, therefore in DOJ's view, for law enforcement purposes and falling under Exemption 7(C).  Waller Decl. ¶ 10,

But OIG records about complaints and investigations that solely implicate FBI guidelines will fall outside Exemption 7(C).  While DOJ asserts that "administrative enforcement proceedings can also fall under Exemption 7(C)," *Kleinert v. Bureau of Land Mgmt.*, 132 F. Supp. 3d 79, 91 (D.D.C. 2015), that case concerned administrative enforcement of a federal regulation against a private citizen, not an investigation into whether an agency employee should be disciplined for violating internal guidelines.  Even the cases cited by DOJ emphasize that law enforcement files should involve "violations of criminal and civil laws" rather than internal agency rules.  *See Nat'l Whistleblower Ctr. v. Dep't of Health & Hum. Servs.*, 849 F. Supp. 2d 13, 27 (D.D.C. 2012) (observing that records fell under Exemption 7(C) when they were "compiled to investigate allegations that [a] specific individual[ ] . . . had engaged in specific acts that could constitute violations of criminal and civil laws."); *Kimberlin*, 139 F.3d  at 947 ("The investigation was intended to discover whether John Thar had violated any law . . . [t]he investigation was not aiming generally . . . to insure that the agency's employees are acting in accordance with statutory mandate and the agency's own regulations.") (cleaned up); *cf. Stern*, 737 F.2d at 89 ("an agency's investigation of its own employees is for law enforcement purposes" so long as "it focuses directly on specifically alleged illegal acts, illegal acts of particular identified officials, acts which could, if proved, result in civil or criminal sanctions") (internal quotation marks omitted).

Another court has reached a similar conclusion that when an agency investigates both administrative misconduct as well as civil and criminal violations, its records pertaining purely to workplace rules may not fall under Exemption 7(C).  *See Goldstein v. Treasury Inspector Gen.*

*for Tax Admin.*, 172 F. Supp. 3d 221, 230 (D.D.C. 2016).  On review of the Treasury

Department's Office of Investigations, that court expressed the view that investigations into

"violations of workplace rules that might not give rise to criminal or civil liability, but might lead

to workplace discipline" did not pertain to a law enforcement function on the record presented.

*Id.*

> *Jefferson v. Dep't of Just., Off. of Pro. Resp.*, 284 F.3d 172 (D.C. Cir. 2002) offers even

more compelling proof that Exemption 7(C) cannot flatly apply to the requested records.  There,

the D.C. Circuit analyzed the DOJ's Office of Professional Responsibility and determined that:

> [t]he Department's regulations describe OPR as a mixed function agency with
> responsibilities that embrace not only investigations of violations of law and
> breaches of professional standards that may result in civil liability, but breaches of
> internal Department guidelines that may lead to disciplinary proceedings, as a result
> of the receipt of reports of investigations by other entities of such non-law
> violations. Hence, a *Glomar* response was inappropriate in the absence of an
> evidentiary record produced by OPR to support a finding that all OPR records
> regarding AUSA Downing are law enforcement records.

*Id.* at 179 (internal citations omitted).  DOJ tries to distinguish *Jefferson*, asserting that the OIG

declaration here is more detailed.  But just like in *Jefferson*, that declaration specifies that OIG is

a mixed function agency that investigat[es] "administrative misconduct on the part of

Department employees," Waller Decl. ¶ 5, and that "[c]omplaints of misconduct by individual

Department employees are reported to and typically investigated by law enforcement agents

assigned to the OIG's Investigation Division for potential criminal or civil prosecution, or

administrative action by the employing Department component," *id.* ¶ 10.  Hence, because some

possible records may concern only investigations into a violation of internal guidelines, not all

OIG records would fall under Exemption 7(C).

5. This Case Does Not Rest on Whether Records Fall Under Exemption 6 or Exemption 7(C)

The parties spend much of their briefing focused on whether Exemption 7(C) or the more disclosure-friendly Exemption 6 should apply here, so the Court has addressed those arguments. But this issue must be placed into perspective. For one thing, even though the Court rejects DOJ's categorical arguments, it cannot ignore that *most* of the records that Plaintiff envisions in its request would clearly fall under Exemption 7(C), including any records of an investigation into Mr. Sallet's alleged violations of constitutional rights. *See* Pl.'s Reply at 4 (conceding that point). Additionally, records concerning possible sexual misconduct could violate workplace anti-discrimination and harassment laws. For another thing, while the tests are different between Exemption 6 and Exemption 7(C), in this case the gap between these inquiries is not large enough to alter the Court's conclusions for the category of records where the appropriate exemption may vary. With that context, the Court proceeds to the balance of interests.

## B. The Balance Favors Sallet's Privacy Interests Over the Public Interest

### 1. Sallet's Privacy Interests Are Substantial But Diminished

To begin, "[a] government employee has at least some privacy interest in his own employment records, an interest that extends to not having it known whether those records contain or do not contain information on wrongdoing, whether that information is favorable or not." *Beck*, 997 F.2d at 1494 (internal quotation marks omitted). That privacy interest only grows when records directly stem from an investigation. The D.C. Circuit has "long recognized" that "the mention of an individual's name in a law enforcement file will engender comment and speculation and carries a stigmatizing connotation." *Roth*, 642 F.3d at 1174 (internal quotation marks omitted. That same principle and privacy interest also holds "in the context of non-criminal investigations[.]" *PETA*, 745 F.3d at 541. Allegations of wrongdoing that can trigger

an investigation "may not be prosecutable offenses" but still may "carry a stigma and can damage a career." *McCutchen v. U.S. Dep't of Health & Hum. Servs.*, 30 F.3d 183, 187 (D.C. Cir. 1994). All in all, given that Plaintiff broadly seeks records relating to any type of allegations or investigations against Mr. Sallet, he plainly has a "strong privacy interest in avoiding the disclosure of any investigation of misconduct." *PETA*, 745 F.3d at 541.

Plaintiff argues that Mr. Sallet's privacy interest is minimized because of his high rank within the FBI and the public allegations against him.[5] DOJ concedes that Mr. Sallet's privacy interest is "'somewhat diminished' given the public offices that he held . . . ." Def.'s Reply at 8 (citing *CREW*, 746 F.3d at 1092). But DOJ correctly adds that "public officials do not surrender all rights to personal privacy when they accept a public appointment." *Id.* (citing *CREW*, 746 F.3d at 1092). The Court agrees Mr. Sallet's high rank in public office—Associate Deputy Director is the third most senior position within the FBI—lowers but does not eliminate his privacy interest. *See Stern*, 737 F.2d at 93–94 (noting that a senior FBI official had less of a privacy interest than lower level employees under his supervision who might have simply been following orders).

Plaintiff asserts that Sallet's decision to "advertise[ ] . . . his experience with the FBI in his current job," Pl.'s Mem. at 16, diminishes his privacy interests even more. The Court does not see how. It is public knowledge that Mr. Sallet worked for the FBI, and one would expect that he would list that role when describing his professional background. That does not change the fact that disclosures of investigations could "damage [Mr. Sallet's] career," *McCutchen*, 30

---

[5] Plaintiff admits that Mr. Sallet has a substantial privacy interest but emphasizes that in the FOIA context, a "substantial privacy interest is anything greater than a de minimis privacy interest." Pl.'s Mem. at 15 (quoting *Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1229–30 (D.C. Cir. 2008)).

F.3d at 187, and cause "reputational harm." *Nation Mag.*, 71 F.3d at 894. Because the D.C. Circuit has repeatedly identified possible damage to an individual's career as *supporting* a privacy interest, Plaintiff is incorrect that Mr. Sallet has diminished his privacy interest by touting his FBI experience.

Plaintiff has more luck when arguing that Mr. Sallet's privacy interests are lowered because it is public knowledge that Mr. Sallet has been accused of wrongdoing. Mr. Zummer filed suit against Mr. Sallet in relation to the loss of his security clearance. *See generally* Zummer Decl. Plaintiff notes that this litigation is public record and was reported in the media when it was filed. *Id.* ¶ 80; *see also FBI agent sues bureau over suspension*, WWL-TV (Aug. 7, 2017), https://www.wwltv.com/article/news/local/fbi-agent-sues-bureau-over-suspension/289-462651967 (last visited Mar. 6, 2024). But "the fact that an event is not wholly private does not mean that an individual has no interest in limiting disclosure or dissemination of the information." *PETA*, 745 F.3d at 542 (quoting *U.S. Dep't of Just. v. Reps. Comm. for Freedom of Press*, 489 U.S. 749, 770). And all that has been publicly reported is that Mr. Zummer believes Mr. Sallet retaliated against him for protected speech. Unlike the cases Plaintiff relies on, Mr. Sallet has not publicly acknowledged Mr. Zummer's allegations, and has not acknowledged that he fell under investigation. *See CREW*, 746 F.3d at 1092 ("DeLay's obvious privacy interest in keeping secret the fact that he was the subject of an FBI investigation was diminished by his well-publicized announcement of that very fact."); *Kimberlin,* 139 F.3d at 949 (finding that a public employee's "statement to the press undoubtedly does diminish his interest in privacy: the public already knows who he is, what he was accused of, and that he received a relatively mild sanction").

The FBI and OIG, however, have effectively acknowledged that they investigated Mr. Sallet based on Mr. Zummer's allegations.  *See PETA,* 745 F.3d at 542 (placing particular weight on an agency's official acknowledgment that it had conducted an investigation into an individual).  While OIG's report does not identify Mr. Sallet by name and instead uses the abbreviation "SAC 2", it specifies that SAC 2 was the head of the New Orleans division at the same time that Mr. Sallet publicly served in that role.[6]  *See generally* Zummer Decl., Ex. E.  To be sure, the OIG report did not aim to specifically investigate Mr. Sallet himself, but Mr. Sallet was interviewed for the report and is mentioned repeatedly across its pages.  This is sufficient to lower Mr. Sallet's privacy interest in the existence of any records considering any complaints, allegations, or investigative records concerning his interactions with Mr. Zummer.  Nevertheless, beyond the OIG report, Plaintiff has not presented other public records or agency acknowledgment about any complaints or investigations related to Mr. Sallet, including for sexual misconduct.

In sum, Mr. Sallet's privacy interest in the existence of responsive records remains substantial but is somewhat lowered by his prominent rank in the FBI, and diminished further to the extent Plaintiff's FOIA request seeks records of "allegations of misconduct against" Mr. Sallet, including any records of "complaints" and "investigative files" that relate to Mr. Zummer's loss of security clearance.  *See* Compl. ¶ 12.  But this additional diminishment does not hold for any broader complaints or investigations about Mr. Sallet that do not relate to Mr. Zummer.

---

[6] The FBI announced Mr. Sallet's ascension to the role.  Zummer Decl. ¶ 12; FBI, Press Release, *Jeffrey S. Sallet Named Special Agent in Charge of New Orleans Division* (Oct. 19, 2015) https://www.fbi.gov/news/press-releases/press-releases/jeffrey-s.-sallet-named-special-agent-in-charge-of-new-orleans-division (last visited Mar. 6, 2024).

2.  The Public Interests

According to Plaintiff, there are three public interests in acknowledging any requested records, and in the records themselves.  First, "whether a high-ranking FBI official engaged in improper conduct, including violations of constitutional rights and sexual misconduct involving employees."  Pl.'s Mem. at 17.  Second, "whether OIG engaged in negligence or some other impropriety by failing to address Sallet's alleged violations of constitutional rights."  *Id.*  Third, "whether DOJ and its components FBI and OIG are effective at addressing misconduct by high-level officials who often can retire before disciplinary action is taken against them."  *Id.*

The Court believes, however, that Plaintiff has presented four public interests.  The first interest asserted by Plaintiff is more accurately characterized as two distinct interests: there is no apparent connection between Plaintiff's allegations that Mr. Sallet violated Mr. Zummer's First Amendment rights and Plaintiff's allegations that Mr. Sallet engaged in sexual misconduct.  Consequently, the Court will discuss these interests separately, and take all four interests in turn.

### a.  Sallet's Alleged First Amendment Violations

"[W]here there is a privacy interest protected by Exemption 7(C) and the public interest being asserted is to show that responsible officials acted negligently or otherwise improperly in the performance of their duties, the requester must establish more than a bare suspicion in order to obtain disclosure."  *Favish*, 541 U.S. at 174.  "Rather, the requester must produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred."[7]  *Id.*  This more stringent standard is because "[a]llegations of government

_____

[7] Although *Favish* involved Exemption 7(C), insofar as it might be relevant to the other possible public interests in this case, both the D.C. Circuit and this Court have observed that *Favish's* evidentiary requirement applies to Exemption 6 as well.  *See Consumers' Checkbook Center v. U.S. Dep't of Health & Human Svcs.*, 554 F.3d 1046, 1054 n.5 (D.C. Cir. 2009); *Pubien v. U.S. Dep't of Justice*, 273 F. Supp. 3d 47, 54 (D.D.C. 2017).

misconduct are 'easy to allege and hard to disprove,' so courts must insist on a meaningful evidentiary showing." *Id.* (quoting *Crawford–El v. Britton*, 523 U.S. 574, 585 (1998)).

The Court is persuaded that Plaintiff has provided evidence that creates more than a bare suspicion of impropriety regarding Mr. Sallet's interactions with Mr. Zummer during their time at the FBI's New Orleans division.  Mr. Zummer's lawsuit did not go forward on jurisdictional grounds, but the evidence shows that Mr. Sallet was involved in the suspension and revocation of Mr. Zummer's security clearance, and that these events were irregular.  OIG's report details that Mr. Zummer sought permission from Mr. Sallet leading up to the release of the 2016 letter, and that Mr. Sallet advised Mr. Zummer not to send the letter.  *See* Zummer Decl., Ex. E at 19.  As part of the report, OIG interviewed Mr. Sallet, who expressed his concerns that Mr. Zummer was a "risk" who "could release any information he came into… the hold of, if he believed that something improper was happening or whatever his view of the world was."  *See id.* at 26.  And although Mr. Sallet did not formally control the suspension of Mr. Zummer's security clearance, he repeatedly attempted to push that process along.  During the initial investigation into whether to suspend Mr. Zummer's security clearance, Mr. Sallet "both directly and through one of his subordinates, inquired … about the progress of [the FBI Security Division]'s review of Zummer's clearance." *Id.* at 29.  Mr. Zummer himself believes that Mr. Sallet "was the primary decisionmaker in having his clearance suspended, because FBI Security Division, responsible for managing employees' clearances, was responsive to requests by field office SACs to suspend clearances," Zummer Decl. ¶ 79, although the Court has not seen other evidence for this contention.

Mr. Sallet's involvement is important because while the OIG's report found that "Mr. Zummer does not have a viable whistleblower retaliation claim in relation to the release of his

August 15, 2016 letter to the judge" given that FBI whistleblower regulations do not designate federal judges as recipients of disclosures, it further "found troubling errors and omissions in the record of the decision to suspend and revoke Zummer's clearance that we believe merit a second look at the suspension and revocation." Zummer Decl., Ex. E at 36. OIG's report does not attribute any of these errors to Mr. Sallet. But given Mr. Sallet's leadership role in the FBI's New Orleans division, his efforts to hurry along the security clearance process, and OIG's findings that the process was improperly rushed, *see id. at* 38–39, it would be reasonable to believe Mr. Sallet played a role in how events unfolded.

Moreover, other aspects of Mr. Sallet's conduct also support a belief that Mr. Sallet may have violated Mr. Zummer's rights. When Mr. Zummer later sought official approval to release his letter to Judge Engelhardt to the public, Mr. Sallet approved substantial redactions to seventeen out of the thirty-one pages in Mr. Zummer's letter. Zummer Decl., Ex. G at 1 (Mr. Sallet emailing "Looks great !" in response to proposed redactions from chief counsel.). Mr. Zummer and the FBI eventually settled Mr. Zummer's First Amendment claim for public release of the letter, and the letter was released with zero redactions, making it questionable whether the heavy redactions were ever appropriate.

Thus, on this evidence, the Court finds that Plaintiff has "produce[d] evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred." *Favish*, 541 U.S. at 174. There is a public interest in records concerning any complaints, allegations, or investigative files about Mr. Sallet's treatment of Mr. Zummer.[8]

---

[8] In finding so, the Court does not address the ultimate legal sufficiency of any First Amendment claim by Mr. Zummer or question the dismissal of his litigation in the Fifth Circuit.

### b.  Purported Sexual Misconduct

The Court is not convinced that Plaintiff has established more than bare suspicion that Mr. Sallet engaged in sexual misconduct during his time at the FBI.  To support these salacious accusations, Plaintiff relies solely on Mr. Zummer's affidavit.  Zummer Decl. ¶ 14.  Mr. Zummer offers an undetailed assertion of various types of sexual wrongdoing by Mr. Sallet, based entirely on hearsay from unidentified FBI employees.  *Id.*

The parties contest how the Federal Rules of Evidence apply in the context of a FOIA "meaningful evidentiary showing." *Favish*, 541 U.S. at 175.  DOJ, citing a D.C. Circuit FOIA case that does not address *Favish*, argues that hearsay is inadmissible in that situation unless it falls within a recognized hearsay exception.  *DiBacco v. Army*, 795 F.3d 178, 189 (D.C. Cir. 2015) (rejecting appellant's argument that district court should not have relied on inadmissible hearsay, because that hearsay fell within an exception).  Plaintiff, without supporting citations, contends that *Favish* commands an analysis that is more akin to a "evidentiary hearing" or "or the preliminary actions in criminal cases" where a court is not bound by evidence rules.  *See* Pl.'s Reply at 14–15.  On its own search, the Court has not located any decisions that resolve whether a plaintiff may ever use hearsay to satisfy the *Favish* standard.[9]

Nevertheless, the Court need not directly decide the issue: it is enough to say that the sexual misconduct accusations in the Zummer declaration are too tenuous to support a public interest.  Plaintiff relies on one paragraph that contains no identifying details about the "current

---

[9] More broadly, "[d]espite the general inadmissibility of hearsay, 'courts may consider hearsay in FOIA cases when assessing the adequacy of the agency's search' and 'FOIA declarants may rely on information obtained through inter-agency consultation.'" *Leopold v. United States Dep't of Just.*, No. 19-cv-3192 (RC), 2021 WL 124489, at *4 (D.D.C. Jan. 13, 2021) (quoting *Humane Soc'y of United States v. Animal & Plant Health Inspection Serv.*, 386 F. Supp. 3d 34, 44 (D.D.C. 2019)).

and former FBI employees" that supposedly spoke to Mr. Zummer, Zummer Decl. ¶ 14, and offers no outside evidence that could give credence to these claims.  While Plaintiff says the allegations have "disturbing specificity," *see* Pl.'s Mem. at 23, the Court cannot agree.  For example, there are few details about when and where these events may have occurred.[10]  Even more damaging to the plausibility of Mr. Zummer's declaration is that, with the one exception of an employee who reportedly heard Mr. Sallet make inappropriate comments, Mr. Zummer does not claim to have heard about the events directly from the FBI employees who experienced them but rather from other FBI employees who were relaying information they had received.  *See* Zummer Decl. ¶ 14.

Plaintiff also argues that the timing of Mr. Sallet's retirement lends credence to its assertions, and that he likely left the FBI to cut short disciplinary proceedings or inquiries regarding sexual misconduct.  But there is nothing inherently suspicious about the timing between Mr. Sallet's elevation to Associate Deputy Director and his departure from the FBI nine months later.  While Plaintiff charges that this maneuver was an attempt to evade discipline through retirement, one could imagine many innocuous reasons why Mr. Sallet would choose to leave shortly after being promoted, including the ability to leverage that new title for better opportunities in the private sector.[11]  Plaintiff's contentions that FBI employees were surprised

---

[10] The Zummer declaration alleges several types of misconduct and then says these accusations are consistent with reports about Mr. Sallet from "when he was in New Orleans" and recounts an inappropriate comment he supposedly made at that time.  Zummer Decl. ¶ 14.  By deduction, that means that the rest of the allegations came at some unknown point after the end of Mr. Sallet's tenure with the FBI's New Orleans division.  The only information regarding location for these events is that one incident occurred "while on official travel."  *Id.*

[11] DOJ speculates that, among other reasons, Mr. Sallet may have left because he was offered higher pay at Ernst & Young.  *See* Def.'s Mem. at 16.  Plaintiff responds by citing generic numbers from glassdoor.com about the compensation of an average partner at Ernst & Young.  *See* Pl.'s Mem. at 25.  These figures fail to illuminate what Mr. Sallet was offered for

by the departure, and that it was unusual within the FBI for Mr. Sallet to retire without notifying other employees, Zummer Decl. ¶ 13; Davidson Decl. ¶ 7, are thinly supported and do not lead to a reasonable inference that Mr. Sallet retired to dodge an investigation.[12]

Ultimately, Plaintiff makes "inflammatory allegation[s]" against a government employee, but "[t]he only support [it] offers" is its "own affidavit, which recounts a litany of allegedly suspicious circumstances but lacks any substantiation." *Blackwell,* 646 F.3d at 41.  At present, the Court finds no public interest stemming from these allegations.

### c.  Misconduct by the OIG

Plaintiff argues that there is a public interest in uncovering whether OIG's report into the suspension of Mr. Zummer's security clearance improperly omitted negative information about Mr. Sallet.  Although DOJ's briefing does not respond to this argument, the Court is unconvinced regardless.  Plaintiff has not established more than a bare suspicion that OIG officials "acted negligently or otherwise improperly in the performance of their duties." *Favish*, 541 U.S. at 174.

In Plaintiff's view, his 2016 letter to Judge Engelhardt revealed OIG's failure to address a conflict of interest and therefore disclosed the OIG's negligence or incompetence.  *See* Pl.'s Mem. at 28–29.  In 2013, Mr. Zummer made a complaint to the OIG regarding the financial relationship between the New Orleans district attorney's defense attorney and an AUSA.

---

his employment, and in any event, there are other benign reasons outside of compensation why Mr. Sallet may have chosen to leave the FBI.

[12] The Court does agree with Plaintiff that it is odd, *see* Pl.'s Mem. at 26–27, that DOJ's FOIA search did not locate any emails or records "by or with FBI Director Christopher Wray, FBI Deputy Director Paul Abbate, or any of their staffs" that concern Mr. Sallet's retirement. Compl. ¶ 12.  But the absence of records is insufficient to support Plaintiff's deductions: perhaps Mr. Sallet and his colleagues preferred to communicate about Mr. Sallet's retirement in person or by phone call.

Zummer Decl. ¶¶ 65–66.  The OIG investigated this complaint at the time and found no

wrongdoing, and the 2018 OIG report into Mr. Zummer's claim of retaliation based on this

complaint did not find reprisal.  *See* Zummer Decl., Ex. E at 8, 14–17.  Plaintiff alleges, though,

that the OIG report failed to accurately describe that the AUSA "divested" his financial interests

by transferring assets to his girlfriend.  Zummer Decl. ¶¶ 66–72.  Plaintiff also says that while

the report says the AUSA was not involved in the decision to decline prosecuting Mr. Morel in

2013, Mr. Zummer observed the AUSA arguing against pursuing the case.  *Id.* ¶ 72.  The OIG

did not take disciplinary action against the AUSA after Mr. Zummer's 2013 complaint, and

Plaintiff suggests that this absence of discipline helped Mr. Morel receive a lenient plea

agreement when the case was revived under a new U.S. Attorney.  *Id.* ¶ 73.

Despite these alleged omissions, Plaintiff has presented only an insufficient "bare

suspicion" of wrongdoing by the OIG.  *Favish*, 541 U.S. at 174.  As Plaintiff sees it, when OIG

investigated Mr. Zummer's claim of retaliation by Mr. Sallet in 2016, "it was investigating

[alleged] retaliation against someone who had disclosed its own negligence or incompetence."

Pl.'s Mem. at 29.  But the Court is unable to accept the several necessary inferences made by

Plaintiff, such as that OIG itself believed that its past conduct was negligent or incompetent, that

it would hold this failure against Mr. Zummer, and that OIG would then respond by failing to

appropriately investigate any accusations against Mr. Sallet.  Indeed, the OIG report hardly

evinces bias against Mr. Zummer: as discussed above, it documents "troubling errors and

omissions in the record of the decision to suspend and revoke Zummer's clearance . . . ."

Zummer Decl., Ex. E at 36.  There is insufficient reason to think that OIG would have "pulled its

punches," Pl.'s Mem. at 29, regarding Mr. Sallet specifically.  That being so, the Court finds that

Plaintiff has not "produced evidence that would warrant a belief by a reasonable person that the

alleged Government impropriety might have occurred," *Favish*, 541 U.S. at 159, and that there is no public interest on this basis in the requested OIG records.[13]

####    d.  *How DOJ Addresses Misconduct Allegations Against FBI Executives*

Unlike the standard in *Favish*, evidence of negligence or impropriety is unnecessary when plaintiffs "are not (or at least not only) seeking to show that the government's…policy is legally improper, but rather to show what that policy is and how effective or intrusive it is." *ACLU*, 655 F.3d at 14 (internal citation omitted).  "Matters of substantive law enforcement policy are properly the subject of public concern, whether or not the policy in question is lawful."  *Id*. (internal quotations and citations omitted).

Plaintiff contends that "FBI executives are escaping potential disciplinary action for misconduct by retiring,"  Pl.'s Mem. at 30, and that there is a public interest in shedding light on this issue.  Apart from Plaintiff's unsupported suggestion that Mr. Sallet falls into that group, Plaintiff does present evidence that this problem may exist more generally.  A 2004 report by former U.S. Attorney General Griffin Bell and former FBI Associate Director Dr. Lee Colwell found that a pattern of retirement or resignation of higher-ranked FBI officials before discipline was imposed contributed to an internal perception that there was a double standard favoring higher-ranked employees.  *See* Griffin B. Bell, Lee Colwell, Study of the FBI's Office of Professional Responsibility (Feb. 2004) at 1–3.  Plaintiff supplements this report with more recent OIG reports where FBI executives retired while under investigation.[14]  *See* Zummer Decl. ¶¶ 30–39.

---

[13] As set forth above, there is still an interest related to Mr. Sallet's alleged impropriety regarding Mr. Zummer.

[14] For example, an FBI Special Agent in Charge was under OIG investigation and retired before being contacted for an interview.  Department of Justice, Office of the Inspector General,

Plaintiff also asserts that the "public has a substantial interest in knowing whether DOJ disciplinary policies and procedures are effective at deterring sexual misconduct by FBI executives." Pl.'s Mem. at 33.  A December 2020 Associated Press investigation identified at least six sexual misconduct allegations involving senior FBI officials over the previous five years.  Zummer Decl. ¶ 48; Jim Mustian, *'Under the rug:' Sexual misconduct shakes FBI's senior ranks*, Associated Press (Dec. 10, 2020), https://apnews.com/article/fbi-sexual-misconduct-investigation-a0d33e4770acef8ff5f4a48f0267202c (last visited Mar. 6, 2024).

The FBI reacted to the Associated Press article by reviewing its disciplinary precedent database for other examples of executives who retired or resigned amid sexual misconduct accusations.  FBI Office of Disciplinary Appeals, *Retirements and Resignations during Unwelcome Sexual Conduct Adjudications* 2 (Dec. 23, 2020).  Plaintiff argues this review was underinclusive and used criteria that failed to capture FBI executives who left the agency *during* investigations, only focusing on those who left after investigations but before a final adjudication.  Plaintiff also notes that this review did not include investigations where executives were accused of consensual but inappropriate sexual misconduct, such as relationships with a subordinate.  Plaintiff observes that Mr. Sallet was the executive who requested that this report be compiled.  *See* Zummer Decl. ¶ 50.

The Court agrees that there is a public interest in the FBI's approach to investigating and reprimanding its executives, including for sexual misconduct, and in whether there is a pattern of executives retiring to avoid accountability.  This interest is not only evident in the abstract but

---

*Investigative Summary 21-090*, (Jul. 6, 2021), https://oig.justice.gov/sites/default/files/reports/21-090.pdf (last visited Mar. 6, 2024),

also supported by evidence that suggests deficiencies in the FBI's policies.  As will be discussed

below, however, that interest must still be balanced with Mr. Sallet's privacy interests.

### 3.  Balancing the Public Interest and Mr. Sallet's Private Interests

The Court must now "balance the privacy interests that would be compromised by

disclosure against the public interest in the release of the requested information."  *Dillon v. U.S.*

*Dep't of Just.*, 444 F. Supp. 3d 67, 94 (D.D.C. 2020) (quoting *Beck*, 997 F.2d at 1491).  Because

the Court rejected two of Plaintiff's proposed public interests—shedding light on Mr. Sallet's

alleged sexual misconduct and the OIG's negligence—the Court declines to conduct further

analysis on that point.  *See Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 879 (D.C.

Cir. 1989) ("something, even a modest privacy interest, outweighs nothing every time").

Weighing the other public interests, and primarily relying on the public interest in uncovering

any impropriety related to Mr. Zummer's loss of security clearance, the Court finds the balance

of interests tilts toward a limited disclosure.

Even though Mr. Sallet has a substantial privacy interest generally, that interest is lower

for the existence of records that accuse him of misconduct with respect to Mr. Zummer's speech

and loss of security clearance.  Because Mr. Zummer has already publicly alleged that Mr.

Sallet's behavior was improper, those accusations received media attention, and most of all, the

OIG released a report that confirmed Mr. Sallet's conduct was part of an internal investigation,

this case is quite different from one where Mr. Sallet could assert "an . . . interest in not being

associated with an investigation in the first place."  *Citizens for Resp. & Ethics in Wash. v. U.S.*

*Dep't of Just.*, 846 F. Supp. 2d 63, 76 (D.D.C. 2012).  And again, Mr. Sallet's high-rank in the

FBI further diminishes his privacy interests.  *CREW*, 746 F.3d at 1092.

The public interests, conversely, are strong for similar reasons.  The public evidently has an interest in the operations of the FBI, and Plaintiff has presented evidence that tips beyond a bare suspicion of wrongdoing.  The full context of Mr. Zummer's termination, as detailed in the OIG report and Mr. Zummer's litigation, indicates that Mr. Zummer may have been impermissibly targeted for exercising his First Amendment rights.  The Court cannot ignore Mr. Sallet's role leading the FBI's New Orleans division and his concomitant participation in efforts to revoke Mr. Zummer's security clearance and prevent his accusations from being released to the public.  These circumstances plainly trigger a public interest in any allegations or investigations of Mr. Sallet, and the existence of any such records.

Conversely, the public interest in the FBI's approach to investigating executives and a pattern of executives retiring to avoid accountability is insufficient to warrant disclosure of the existence of *any* records about complaints or investigations into Mr. Sallet.  True, because Plaintiff seeks all records relating to complaints and investigations, and one could imagine hypothetical records that would not qualify as law enforcement records under Exemption 7(C), some records may concern only the more disclosure-friendly Exemption 6.  But the Court is without reason to split hairs on this point.  Mr. Sallet retains a privacy interest in his personnel records under Exemption 6, *Beck*, 997 F.2d at 1494, and because the Court has rejected Plaintiff's speculative allegations that Mr. Sallet retired to dodge an investigation, the "necessary nexus between the requested information and the asserted public interest that would be advanced by disclosure" is absent.  *Favish*, 541 U.S. at 172–73.  In other words, any public interest in FBI policy generally would boil down only to "[a] mere desire to review how an agency is doing its job, coupled with allegations that it is not," which "does not create a public interest sufficient to override [Mr. Sallet's] privacy interests."  *McCutchen*, 30 F.3d at 188.

Overall, as this case concerns Mr. Sallet's alleged violations of Mr. Zummer's constitutional rights, and the loss of Mr. Zummer's security clearance, the Court sees this case as resembling *Stern v. FBI*, 737 F.2d 84, 94 (D.C. Cir. 1984)*.*  In *Stern*, the Court ordered that the FBI could not issue a *Glomar* response under Exemption 7(C) regarding the identity of an FBI Special Agent in Charge who was censured for withholding information from an FBI audit.  737 F.2d at 94.  The Court emphasized that agent's rank, the same as Mr. Sallet's in 2016, and noted that he "followed a deliberately-chosen course when placed, perhaps, between a hard rock and his conscience."  *Id.*  While the evidence that Mr. Sallet committed wrongdoing is weaker than in *Stern*, so too is the damage that would result from any confirmation that investigative records exist.  Unlike in *Stern*, the existence of any records would not implicate Mr. Sallet in "notorious and serious allegations of criminal wrongdoing," *id.* at 93, or malfeasance described as "intolerable" by the FBI, *id.* at 94.  The records would merely confirm that FBI and OIG received and investigated complaints about Mr. Sallet related to a possible violation of Mr. Zummer's First Amendment rights.  And given what we know about Mr. Zummer's pattern of litigation, his well-established grievances against Mr. Sallet, and the OIG report, it is effectively already known that at least *some* responsive records likely exist.[15]

---

[15] The Court is mindful that it cannot order the FBI and OIG to only conduct a search into "complaints" or "allegations" against Mr. Sallet.  Because the FOIA request includes such language, "[t]he request therefore encompasses the stages antecedent to an investigation, including documents explaining why an investigation did or did not occur."  *PETA*, 745 F.3d at 544.  If the FBI and OIG were "required to acknowledge responsive documents in instances where there was no investigation but were permitted to give a *Glomar* response in cases where there had been one, it would become apparent that a *Glomar* response really meant that an investigation had occurred."  *Id.*  To hold otherwise would obviate "the uncertainty essential to *Glomar*'s efficacy."  *Id.*  But, after taking this dynamic in consideration, the Court still finds disclosure of the existence of any investigations is warranted.

The D.C. Circuit has emphasized that the balance of interests must be fact-specific to each FOIA case. *See Bartko,* 898 F.3d at 66. Having considered the full context of Plaintiff's FOIA request, the Court finds that for some possible records, the public interest in the existence of records outweighs Mr. Sallet's privacy interests.

\* \* \*

The upshot of the Court's analysis is that the FBI and OIG may not permissibly issue a *Glomar* response as to the existence of responsive records that concern Mr. Sallet's role in the loss of Mr. Zummer's security clearance and any records about allegations that Mr. Sallet violated Mr. Zummer's constitutional rights. *See PETA,* 745 F.3d at 544–545 ("Because there exists a category of responsive documents for which a *Glomar* response would be unwarranted, NIH's assertion of a blanket *Glomar* response to the second request cannot be sustained."). "[A]n agency may issue a blanket *Glomar* response ... only when 'the circumstances justify a *Glomar* response' for all categories of responsive records." *Project for Priv. & Surveillance Accountability, Inc. v. United States Dep't of Just.*, 633 F. Supp. 3d 108, 122 (D.D.C. 2022) (quoting *PETA,* 745 F.3d at 541). Mr. Sallet's privacy interest in the specified category is low, and the public interest is sizable. Thus, the agencies must search for any records concerning complaints, allegations, investigative files, and dispositions of any allegations into Mr. Sallet that relate to the alleged 2016 retaliation incident and any violation of Mr. Zummer's constitutional rights. Once such search has been completed, if responsive records are located the FBI and OIG must justify any withholdings in the traditional manner. But because Mr. Sallet's privacy interests otherwise overcome any public interest into a broad inquiry into his conduct between 2016 and 2021, the FBI and OIG are justified in asserting a *Glomar* response as to the existence of records about complaints or investigations into Mr. Sallet for any other reason.

Finally, "[t]he question of disclosure of the existence or nonexistence [of records] … is a distinct question from disclosure of the content of the records."  *McMichael v. U.S. Dep't of Def.*, 910 F. Supp. 2d 47, 52 (D.D.C. 2012).  The Court does not presently rule whether any responsive records must be released.

## V.  CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (ECF No. 13) is **GRANTED IN PART AND DENIED IN PART** and Plaintiff's cross-motion for summary judgment (ECF No. 15) is **GRANTED IN PART AND DENIED IN PART**.  The parties are **ORDERED** to submit a proposed schedule for further proceedings within 30 days of the issuance of this opinion.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  March 6, 2024                                         RUDOLPH CONTRERAS
                                                                          United States District Judge